UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PRIME CAPITAL VENTURES, LLC,

                Plaintiff,              **MEMORANDUM OF LAW**

       -against-               Civil Case No.:1:23-cv-00207
                                    (FJS/DJS)

REIGN FINANCIAL INTERNATIONAL, INC.,
GIORGIO JOHNSON, GARY MILLS AND
MARTIN KARO,

                Defendants.

_____

---

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION
OR TO DISMISS THE COMPLAINT
AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION
TO AMEND THE COMPLAINT**

---

**GIRVIN & FERLAZZO, P.C.**
*Attorneys for Plaintiff*
20 Corporate Woods Blvd.
Albany, New York 12211
(518) 462-0300

On the brief:
Daniel S. L. Rubin, Esq., of Counsel
Patrick J. Fitzgerald, Esq., of Counsel
Bonnie R. Watson, Esq., of Counsel

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 3

    I.       PRIME SHOULD BE GRANTED LEAVE TO AMEND ITS PLEADING,
           AND DEFENDANTS' MOTION TO DISMISS MUST BE DENIED
           BECAUSE PRIME'S PROPOSED AMENDED PLEADING STATES
           VIABLE CLAIMS. ............................................................................................. 3

           A.       Prime's Allegations Are Sufficiently Specific to State a Valid Fraud
                   Claim. ........................................................................................................ 4

           B.       The Fraud Claim Is Not Barred by the Fact that Prime and Reign
                   Had a Contract. ......................................................................................... 7

           C.       The Conversion Claim Is Not Barred by the Fact that Prime and
                   Reign Had a Contract. ............................................................................... 9

           D.       The Quasi-Contract Claims Are Cognizable Because Prime Has
                   Now Voided the Contract. ....................................................................... 11

           E.       This Court Has Long-Arm Jurisdiction over Karo. ................................. 11

    II.      DEFENDANTS CANNOT RELY UPON THE AGREEMENT TO
           DEFEAT PRIME'S CLAIMS BECAUSE PRIME HAS VALIDLY
           VOIDED THE AGREEMENT. ........................................................................ 14

           A.       Prime Has Validly Voided the Agreement, Clearing the Way for
                   the Tort and Quasi-Contract Claims It Now Asserts. .............................. 14

           B.       The Agreement's Limitation of Liability Clause Does Not Bar
                   Prime's Claims Against Reign. ................................................................ 17

    III.    THE ARBITRATION CLAUSE IS UNENFORCEABLE. .................................. 19

           A.       The Arbitration Clause Has Been Voided by Prime's Termination
                   of the Agreement. ..................................................................................... 20

           B.       Prime's Claims Do Not "Arise From" the Agreement. ............................ 23

           C.       Defendants' Motion to Compel Arbitration Must Be Denied. ................. 25

CONCLUSION ............................................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*Air China, Ltd. v. Kopf*,
   473 F. App'x 45 (2d Cir. 2012) ........................................................................................ 10

*Alix v. McKinsey & Co.*,
   23 F.4th 196 (2d Cir. 2022),
   *cert. denied*, 214 L. Ed. 2d 132, 143 S. Ct. 302 (2022) ...................................................... 4

*ALP, Inc. v. Moskowitz*,
   204 A.D.3d 454, 167 N.Y.S.3d 45 (2022) ......................................................................... 24

*Alvarez v. Experian Info. Sols., Inc.*,
   No. 19CV03343JSJMW, 2023 WL 2519249 (E.D.N.Y. Mar. 15, 2023) ......................... 20

*Chapin Home for the Aging v. McKimm*,
   No. 11CV0667FBRER, 2014 WL 12883697 (E.D.N.Y. Aug. 7, 2014),
   *report and recommendation adopted*, No. 11-CV-00667 FB RER,
   2014 WL 4662401 (E.D.N.Y. Sept. 18, 2014) ................................................................ 14

*City of Almaty, Kazakhstan v. Sater*,
   No. 19CV2645AJNKHP, 2019 WL 6681560 (S.D.N.Y. Dec. 6, 2019),
   *objections overruled sub nom. City of Almaty v. Sater*, No. 19-CV-2645 (AJN),
   2021 WL 4940304 (S.D.N.Y. Oct. 22, 2021) .................................................................... 24

*Clifton D. Mayhew, Inc. v. Mabro Const., Inc.*,
   383 F. Supp. 192 (D.D.C. 1974) ...................................................................................... 23

*Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*,
   68 N.Y.2d 954, 502 N.E.2d 1003 (1986) ........................................................................... 8

*E & B Giftware, LLC v. Kinsbourne*,
   No. 14 CV 4709 VB, 2015 WL 2330469 (S.D.N.Y. May 12, 2015) ............................... 21

*First Bank of Americas v. Motor Car Funding, Inc.*,
   257 A.D.2d 287, 690 N.Y.S.2d 17 (1999) .......................................................................... 8

*Foman v. Davis*,
   371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) .......................................................... 3

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
   371 F. Supp. 2d 571 (S.D.N.Y. 2005),
   *amended*, No. 03 CIV. 2387 (LAK), 2005 WL 1489176 (S.D.N.Y. June 22, 2005) ....... 22

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*,
   667 F. Supp. 2d 308 (S.D.N.Y. 2009) .............................................................................. 13

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010)................................................ 20

*HD Brous & Co. v. Synthesys Secure Techs., Inc.*,
    229 F. Supp. 2d 191 (E.D.N.Y. 2002) ............................................................................ 12

*Hernandez v. Money Source Inc.*,
    No. CV176919GRBAKT, 2021 WL 1402257 (E.D.N.Y. Mar. 5, 2021) .......................... 9

*Hoffmann v. Kashi Sales, L.L.C.*,
    No. 21 CV 9642 (VB), 2022 WL 17823171 (S.D.N.Y. Dec. 20, 2022)............................ 5

*In re CCT Commc'ns, Inc.*,
    64 B.R. 97 (Bankr. S.D.N.Y. 2011)................................................................................ 17

*In re Skat Tax Refund Scheme Litig.*,
    356 F. Supp. 3d 300 (S.D.N.Y. 2019)............................................................................. 11

*Indian Harbor Ins. Co. v. Glob. Transp. Sys., Inc.*,
    197 F. Supp. 2d 1 (S.D.N.Y. 2002) ............................................................................... 25

*Israel v. Chabra*,
    12 N.Y.3d 158, 906 N.E.2d 374 (2009).......................................................................... 19

*L & R Expl. Venture v. Grynberg*,
    22 A.D.3d 221, 804 N.Y.S.2d 286 (2005) ...................................................................... 21

*Lam v. Am. Exp. Co.*,
    265 F. Supp. 2d 225 (S.D.N.Y. 2003)........................................................................... 7, 9

*Lamoureux v. Trustco Bank*,
    592 F. Supp. 3d 14 (N.D.N.Y. 2022)............................................................................ 3, 11

*Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*,
    67 F.4th 107 (2d Cir. 2023) ........................................................................................... 20

*Loop Prod. v. Cap. Connections LLC*,
    797 F. Supp. 2d 338 (S.D.N.Y. 2011)............................................................................ 12

*Melkaz Int'l Inc. v. Flavor Innovation Inc.*,
    167 F.R.D. 634 (E.D.N.Y. 1996).................................................................................... 12

*Mohegan Lake Motors, Inc. v. Maoli*,
    559 F. Supp. 3d 323 (S.D.N.Y. 2021),
    *opinion clarified sub nom. Mohegan Lake Motiors, Inc. v. Maoli*,
    No. 16-CV-6717 (NSR), 2023 WL 1070247 (S.D.N.Y. Jan. 27, 2023)............................ 8

*Ne. & Cent. Contractors, Inc. v. Quanto Cap., LLC*,
    203 A.D.3d 925, 165 N.Y.S.3d 111 (2022) ................................................................. 20, 25

*New York News Inc. v. Newspaper Guild of New York*,
    927 F.2d 82 (2d Cir. 1991)................................................................................................. 23

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)............................................................................................... 25

*Norcom Elecs. Corp. v. CIM USA Inc.*,
    104 F. Supp. 2d 198 (S.D.N.Y. 2000)................................................................................ 23

*Onekey, LLC v. Byron Place Assocs., LLC*,
    200 A.D.3d 896, 160 N.Y.S.3d 301 (2021) ...................................................................... 19

*PDK Labs, Inc. v. Friedlander*,
    103 F.3d 1105 (2d Cir. 1997)............................................................................................. 12

*Petition of Kinoshita & Co.*,
    287 F.2d 951 (2d Cir. 1961)............................................................................................... 21

*Pettaway v. Nat'l Recovery Sols., LLC*,
    955 F.3d 299 (2d Cir. 2020)................................................................................................. 4

*Pike Co., Inc. v. Tri-Krete Ltd.*,
    349 F. Supp. 3d 265 (W.D.N.Y. 2018).............................................................................. 24

*Primavera Familienstiftung v. Askin*,
    173 F.R.D. 115 (S.D.N.Y. 1997) ......................................................................................... 5

*Ratermann v. Pierre Fabre USA, Inc.*,
    No. 22-CV-325 (JMF), 2023 WL 199533 (S.D.N.Y. Jan. 17, 2023) ............................... 17

*Ross v. A. H. Robins Co.*,
    607 F.2d 545 (2d Cir. 1979)................................................................................................. 4

*Sabilia v. Richmond*,
    No. 11 CIV. 739 JPO MHD, 2011 WL 7091353 (S.D.N.Y. Oct. 26, 2011),
    *report and recommendation adopted*, No. 11-CV-739 JPO,
    2012 WL 213656 (S.D.N.Y. Jan. 24, 2012) ..................................................................... 10

*Solvents & Petroleum Serv., Inc. v. Cyber Sols. Integration Inc.*,
    No. 521CV485FJSTWD, 2022 WL 798333 (N.D.N.Y. Mar. 16, 2022).......................... 12

*Speedfit LLC v. Woodway USA, Inc.*,
    No. 22-CV-4733 (CS), 2022 WL 17167985 (S.D.N.Y. Nov. 22, 2022) .......................... 19

*State v. Vayu, Inc.*,
  39 N.Y.3d 330, 206 N.E.3d 1236 (2023)........................................................................ 12

*STMicroelectronics v. Credit Suisse Grp.*,
  775 F. Supp. 2d 525 (E.D.N.Y. 2011) ............................................................................. 10

*Taylor Precision Prod., Inc. v. Larimer Grp., Inc.*,
  No. 1:15-CV-4428 (ALC), 2018 WL 4278286 (S.D.N.Y. Mar. 26, 2018) ....................... 7

*Universal Surv. Ctr., Inc. v. Precision Opinion, Inc.*,
  No. 16 CIV. 8259 (AKH), 2017 WL 11615246 (S.D.N.Y. June 14, 2017) ...................... 4

*VTech Holdings Ltd. v. Lucent Techs., Inc.*,
  172 F. Supp. 2d 435 (S.D.N.Y. 2001)............................................................................... 8

*Webb v. Wellins*,
  No. 98-CV-1113(FJS)(GJS), 1999 WL 31113 (N.D.N.Y. Jan. 21, 1999)....................... 20

*White v. Davidson*,
  150 A.D.3d 610, 55 N.Y.S.3d 223 (2017) ........................................................................ 5

*Wu v. Uber Techs., Inc.*,
  78 Misc. 3d 551, 186 N.Y.S.3d 500 (N.Y. Sup. Ct. 2022) .............................................. 23

*Wyle Inc. v. ITT Corp.*,
  130 A.D.3d 438, 13 N.Y.S.3d 375 (2015) ........................................................................ 8

**RULES**

Fed. R. Civ. P. 15.................................................................................................................. 3

N.Y. C.P.L.R. 302................................................................................................................. 12

**TREATISES**

28 N.Y. Prac., Contract Law § 13:13................................................................................... 15

28 N.Y. Prac., Contract Law § 5:11..................................................................................... 5

5 N.Y. Jur. 2d Arbitration and Award § 53 ......................................................................... 24

**OTHER AUTHORITIES**

ICC, *Arbitration Rules & Mediation Rules* booklet
  (available at https://iccwbo.org/news-publications/arbitration-adr-rules-and-
  tools/arbitration-rules-and-mediation-rules/)...................................................................... 22

Plaintiff Prime[1] submits this Memorandum of Law in opposition to Defendants' motion to compel arbitration or dismiss and in support of Prime's cross-motion to amend its complaint.

## INTRODUCTION

This action arises from a fraud jointly orchestrated upon Prime by all of the named Defendants in this action.  While the full details of Defendants' fraud are obviously known only to Defendants, badges of fraud – implicating each of the named Defendants – abound.  As explained in greater detail in the Proposed Second Amended Complaint ("SAC"), Mills and Johnson each made specific representations to Prime in September and October 2022, which Prime relied upon when it executed the Agreement on October 3, 2022 (Dkt. No. 4-1).  Pursuant to the Agreement, Prime believed it was making a $20 million investment in an international arbitrage program described more fully in the SAC (the "Program").  In accordance with the Agreement, Prime wired $20 million ("Prime's Funds") to nonparty hedge fund Berone Capital ("Berone") on October 21, 2022.  Rather than invest Prime's Funds in the Program as agreed, on November 1, 2022, Mills, Johnson and/or Karo used Prime's Funds as collateral to obtain a $12 million loan wholly unrelated to the Program.  On November 7, 2022, the $12 million loan proceeds were disbursed to Karo.  Notably, according to Berone, timely payments on the $12 million loan have not been made, and the loan is in default.  Tellingly, as late as January 2023, two months after Mills, Johnson and/or Karo collateralized Prime's Funds and Mills, Johnson and/or Karo absconded with the $12 million, Mills and Johnson were duplicitously reassuring Prime that the Program was moving forward and Prime's Funds would be invested as agreed.

---

[1] This brief uses the same short names adopted by the pleadings and by Defendants' motion papers.

Once Prime began to suspect that something was amiss,[2] and that the Program might be a sham, Prime reacted, on January 24, 2023, by demanding its money back. Though Reign's chief legal officer acknowledged that Reign was in breach of the Agreement and responsible for returning Prime's Funds, the breach was never cured, and Prime is therefore entitled, pursuant to Paragraph 10.1 of the Agreement (the "Escape Clause"),[3] unilaterally and without further notice, to void the Agreement in its entirety.

Prime's voiding of the Agreement was already alleged in the FAC (FAC, ¶ 48), but perhaps inartfully or without sufficient emphasis. Prime seeks to amend its pleading to more accurately reflect the true nature of its claims – namely, that it has elected to void the Agreement and that its claims accordingly sound in tort and quasi-contract.[4] The SAC filed herewith supplies additional factual details to rectify any potential deficiencies raised by Defendants' motion to dismiss.

Further, and as explained below, because Reign has not cured its breach, Prime is entitled to void the Agreement and Defendants cannot enforce the arbitration clause (¶ 7 of the Agreement, hereinafter "Arbitration Clause") or the purported limitation on Reign's liability for the return of Prime's Funds.

Respectfully, the Court's only task at present is to determine (1) whether Prime has validly voided the Agreement, in which case the Arbitration Clause is void, and (2) whether Prime's factual allegations, as amplified in its proposed SAC, state cognizable claims. Both questions

---

[2] Prime did not discover the existence of the $12 million loan until after this action was commenced on February 15, 2023 – which discovery precipitated the filing of the First Amended Complaint (Dkt. No. 4, hereinafter "FAC") and the addition of the fraud allegations.

[3] Paragraph 10.1 of the Agreement states: "If either Party breaches this Agreement, unless otherwise provided herein, the breaching Party shall have ten (10) business days to cure the breach. If the breach is not cured within the time allotted, the Agreement may be voided by the non-breaching Party."

[4] Prime included a breach of contract claim in the FAC in the alternative, in the event this Court determined the Agreement was not void.

should be answered in the affirmative.  Defendants' motion must accordingly be denied, and Prime's motion to amend granted.

## ARGUMENT

I.     **PRIME SHOULD BE GRANTED LEAVE TO AMEND ITS PLEADING, AND DEFENDANTS' MOTION TO DISMISS MUST BE DENIED BECAUSE PRIME'S PROPOSED AMENDED PLEADING STATES VIABLE CLAIMS.**

Leave to amend a complaint pursuant to Fed. R. Civ. P. 15 "should be freely given in the absence of any apparent or declared reason to not grant leave to amend, such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment." *Lamoureux v. Trustco Bank*, 592 F. Supp. 3d 14, 26 (N.D.N.Y. 2022).[5]  "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962).

As set forth below, the proposed SAC supplements the FAC with additional factual details to more fully delineate the false representations, promises, and wrongful acts of each of the individual Defendants herein, as well as to clarify the roles of each Defendant in furthering their joint fraudulent scheme.  It also more accurately pleads Prime's theories of liability against each Defendant and clarifies that in addition to its fraud and conversion claims, Prime is asserting valid quasi-contract claims (specifically, promissory estoppel against the Defendants which directly made representations upon which Prime relied, and unjust enrichment against Karo as the beneficiary of the cash withdrawn by Defendants against Prime's Funds).

---

[5] Quotations in this brief have been cleaned up to omit citations and extraneous punctuation.

"[W]hen faced with an amended complaint, [the Court] may either deny a pending motion to dismiss as moot or consider the merits of the motion, analyzing the facts as alleged in the amended pleading." *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303 (2d Cir. 2020). In case the Court opts for the second of these alternatives, Prime responds to Defendants' motion to dismiss on its merits, in light of the amended allegations of the proposed SAC.

### A.   Prime's Allegations Are Sufficiently Specific to State a Valid Fraud Claim.

Notwithstanding the requirement that fraud claims be pled with specificity, the Court must be careful not to expect a plaintiff to provide details which "are rarely within the knowledge of a victim of fraud and are more appropriately left for discovery." *Alix v. McKinsey & Co.*, 23 F.4th 196, 209 (2d Cir. 2022), *cert. denied*, 214 L. Ed. 2d 132, 143 S. Ct. 302 (2022). "Courts should not demand a level of specificity in fraud pleadings that can only be achieved through discovery," and allegations of "specific misrepresentations" made while a contract was being negotiated which led the complainant to agree to a bad bargain are sufficient to support a fraud claim. *Universal Surv. Ctr., Inc. v. Precision Opinion, Inc.*, No. 16 CIV. 8259 (AKH), 2017 WL 11615246, at *2 (S.D.N.Y. June 14, 2017). "[A]llegations may be based on information and belief when facts are particularly within the opposing party's knowledge, provided that they adduce specific facts supporting a strong inference of fraud." *Alix*, 23 F.4th at 209.

The flexibility of the specificity requirement is particularly important when it comes to pleading a defendant's scienter. Because a court "cannot realistically expect [a plaintiff] to be able to plead defendants' actual knowledge," the plaintiff need only "supply a factual basis for [its] conclusory allegations regarding that knowledge." *Ross v. A. H. Robins Co.*, 607 F.2d 545, 558 (2d Cir. 1979). The requisite scienter "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute

4

strong circumstantial evidence of conscious misbehavior or recklessness." *Hoffmann v. Kashi Sales, L.L.C.*, No. 21 CV 9642 (VB), 2022 WL 17823171, at *7 (S.D.N.Y. Dec. 20, 2022). In a multi-defendant action, "the failure to separate allegations of knowledge [as to each particular defendant] is not fatal." *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 128 (S.D.N.Y. 1997).

Prime has met these pleading requirements. It has alleged that Mills and Johnson (both of whom were communicating with Prime as agents of Reign) persuaded Prime to enter into the Agreement by falsely claiming that Reign had the experience, connections, ability, and intent to invest Prime's Funds in a highly complex international arbitrage investment program – a program that Prime could only access through Reign's alleged relationships. SAC, ¶¶ 16-23, 53-54.

The events that transpired after Prime tendered Prime's Funds clearly support – with as much specificity as Prime can possibly be expected to provide without the benefit of discovery – a strong inference that the earlier representations[6] by Mills and Johnson were wholly and knowingly false and that Defendants made these false promises to induce Prime to give Reign control over Prime's Funds. Suspiciously, around the same time as Prime signed the Agreement, Johnson contacted Prime on Karo's behalf to solicit another investment that would have given Karo direct control over Prime's money. Prime expressly turned down this proposal because Prime was alarmed by Karo's checkered past and did not want to do business with him. SAC, ¶¶ 21-22,

---

[6] Defendants argue in a footnote that the Agreement's merger clause, ¶ 9.1, precludes Prime from basing its fraud claim on any representations. Dkt. No. 26-1, p. 16 n.8. However, the merger provision contains no survival clause, and thus is void because Prime has now voided the Agreement. *See* Point II below. More importantly, "[a]n ordinary merger or integration clause, standing alone, may not preclude a claim of fraud in the inducement . . . . Contract language will preclude a fraud claim only where the language specifically disclaims representations concerning the matter to which the fraud claim relates." 28 N.Y. Prac., Contract Law § 5:11; *accord White v. Davidson*, 150 A.D.3d 610, 612, 55 N.Y.S.3d 223, 224–25 (2017). The Agreement's boilerplate merger clause does not limit Prime's claims.

42-48.  A few days later, before Prime tendered Prime's Funds, Prime sought and received reassurance from Mills that if the investment program envisioned in the Agreement did not succeed, Prime would promptly receive a refund of Prime's Funds in their entirety.  SAC, ¶¶ 49-51.  Prime obviously relied on Mills's post-Agreement assurance in proceeding to tender its funds. SAC, ¶¶ 52, 98, 108, 111.

Instead of taking any steps whatsoever to use Prime's Funds for the agreed-upon investment program, Reign almost immediately pledged the funds as collateral for a line of credit and then enabled the cash from that line of credit to be disbursed to Karo.  SAC, ¶¶ 58-63.  Then, over the ensuing three months (November 2022 through January 2023), Mills repeatedly and falsely told Prime that Reign was still working on investing Prime's Funds in the arbitrage program – which was completely and knowingly false, as Prime's Funds had already been encumbered to supply cash to the very person, Karo, whom Prime had specifically refused to do business with. SAC, ¶¶ 65-71.

Even after Prime asked on January 24, 2023 for Prime's Funds to be returned, Defendants' lies continued. Johnson finally, but vaguely, confessed that Reign had tied up Prime's Funds in an unauthorized transaction.  Then, for a while, Johnson, Mills, and Reign's general counsel proceeded to falsely assure Prime that they were trying to unwind the unauthorized transaction and that Prime's Funds would be released soon.  SAC, ¶¶ 72-81.  It was only after commencing this lawsuit that Prime even discovered – from the nonparty hedge fund Berone, not from any of the Defendants – the true nature of Defendants' encumbrance of Prime's Funds and the fact that Karo had collected the proceeds of the unauthorized loan.  SAC, ¶¶ 83-84.  Further, and perhaps even more tellingly, according to non-party Berone, the unauthorized loan is now in default because Defendants have failed to make timely payments on the loan.  SAC, ¶ 85.

Viewed together, Reign's failure to take any steps towards investing Prime's Funds as agreed, Johnson's oddly contemporaneous attempt to solicit funds for a transaction with Karo, Reign's almost-immediate use of Prime's Funds to supply cash to Karo, and Reign's months-long concealment of the defalcation of Prime's Funds, are badges of fraud that strongly imply a fraudulent scheme by the Defendants to deprive Prime of its funds by setting up a fabricated investment Program and diverting Prime's Funds. At this early stage of the litigation, these allegations are more than adequate to state a claim for fraud.

## B. The Fraud Claim Is Not Barred by the Fact that Prime and Reign Had a Contract.

As a preliminary matter, "a fraud claim may be dismissed as duplicative only as against a defendant against whom the related contract claim is viable," so at the very least, Prime's fraud claim is viable against all the individual Defendants, who were not parties to the Agreement. *See Taylor Precision Prod., Inc. v. Larimer Grp., Inc.*, No. 1:15-CV-4428 (ALC), 2018 WL 4278286, at *19 (S.D.N.Y. Mar. 26, 2018).

More importantly, Prime's fraud claim is not "duplicative" simply because the underlying facts of this case involved a contractual relationship. A plaintiff that asserts a fraud claim which is factually interwoven with a contract can pursue the fraud claim if he can "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Lam v. Am. Exp. Co.*, 265 F. Supp. 2d 225, 230 (S.D.N.Y. 2003).

With respect to the second *Lam* option (collateral misrepresentation), "a promise made with a preconceived and undisclosed intention of not performing it constitutes a misrepresentation," and so does "a representation of present fact, not of future intent." *Deerfield*

*Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956, 502 N.E.2d 1003, 1004 (1986);
*see also Wyle Inc. v. ITT Corp.*, 130 A.D.3d 438, 439, 13 N.Y.S.3d 375, 376 (2015).  "[I]f a
plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented
material facts, the plaintiff has stated a claim for fraud even though the same circumstances also
give rise to the plaintiff's breach of contract claim. Unlike a misrepresentation of future intent to
perform, a misrepresentation of present facts is collateral to the contract (though it may have
induced the plaintiff to sign the contract) and therefore involves a separate breach of duty."  *First
Bank of Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 291–92, 690 N.Y.S.2d 17, 21
(1999); *accord Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 343 (S.D.N.Y. 2021),
*opinion clarified sub nom. Mohegan Lake Motiors, Inc. v. Maoli*, No. 16-CV-6717 (NSR), 2023
WL 1070247 (S.D.N.Y. Jan. 27, 2023); *VTech Holdings Ltd. v. Lucent Techs., Inc.*, 172 F. Supp.
2d 435, 440 (S.D.N.Y. 2001).

Prime's claims do arise in part from Defendants' failure to honor their promise that Prime's
Funds would be invested in the arbitrage program and would be returned if the program failed –
which is admittedly related to the Agreement.  However, more importantly, Prime also alleges that
while the parties were negotiating the Agreement, Defendants misrepresented "present facts" by
characterizing Reign as an experienced international investment firm with the connections and
expertise to successfully shepherd Prime's Funds into a highly exclusive investment program.
SAC, ¶¶ 15-20, 21-23, 95.  In reality, Reign was either fabricating the Program from whole cloth
or embellishing its qualifications as part of a fraudulent scheme to obtain cash for Karo.  SAC, ¶¶
53-55, 97-99.   Prime also expressly warned Johnson, Mills, and Karo – separately and
independently from the Agreement – that it did not want to do business with Karo.  SAC, ¶¶ 22,
44-46.  Defendants clandestinely reacted to this warning by continuing undeterred with their plan

to use Prime's Funds for Karo's benefit, all while concealing their duplicity from Prime.[7]   SAC,
¶¶ 58-84, 100-01.   Prime states a claim for fraud because Defendants' secret scheme was
extraneous to the Agreement.

Prime's fraud claim is also viable under the third *Lam* option (special damages).
Specifically, a plaintiff can maintain a fraud claim for "special damages" that might not be
recoverable via a basic breach of contract claim, such as consequential damages for forgoing other
economic opportunities in order to pursue the illusory opportunity offered by the defendant.   *Lam*,
265 F. Supp. 2d at 231–32; *see also Hernandez v. Money Source Inc.*, No. CV176919GRBAKT,
2021 WL 1402257, at \*8-\*9 (E.D.N.Y. Mar. 5, 2021).   Prime's claimed damages include the
economic loss it has suffered (and will continue to suffer as long as Prime's Funds remain
encumbered) because it lost the opportunity to invest its $20 million elsewhere – not to mention
the damages it is suffering because Prime's Funds are depreciating due to Defendants' default on
the loan they took out against Prime's Funds.   SAC, ¶¶ 85, 93, 106.   These are not strictly
contractual damages (unlike, for example, the damages Prime has suffered by realizing no profits
from the Program), so Prime should be permitted to maintain its fraud claim in order to recover
these special damages.

### C.   The Conversion Claim Is Not Barred by the Fact that Prime and Reign Had a Contract.

Where a plaintiff alleges acts "that could be viewed as unlawful or wrongful as opposed to
mere violations of contractual rights," it can assert a conversion claim even if the claim arises from
events that were related to a contract.   *STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d

---

[7] Fraud claims can arise from concealment, rather than affirmative misrepresentations, "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge," a scenario which "usually arises in the context of business negotiations where parties are entering a contract," exactly as it did here.   *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291–92 (2d Cir. 2006).

525, 543 (E.D.N.Y. 2011). Thus, in a case with remarkable factual similarities to the instant action, the court allowed a conversion claim where the plaintiff alleged that the defendant's agents had used the plaintiff's investment funds for unauthorized investments, that the defendant had subsequently been dishonest to investors about its agents' actions, and that the defendant had failed to return the plaintiff's funds, instead leaving the funds marooned in a frozen account. *Id.* at 531-34, 543 (also noting that retention of a plaintiff's funds and "misrepresentations made after the fact" support a conversion claim); *see also Sabilia v. Richmond*, No. 11 CIV. 739 JPO MHD, 2011 WL 7091353, at \*20 (S.D.N.Y. Oct. 26, 2011), *report and recommendation adopted*, No. 11-CV-739 JPO, 2012 WL 213656 (S.D.N.Y. Jan. 24, 2012). Here, Prime's conversion claim is viable and non-duplicative because Defendants' misappropriation of Prime's Funds was independently tortious and because this claim is based in part on Defendants' continued course of misconduct after the Agreement had already been signed, honored by Prime, and dishonored by Reign – including Defendants' months-long concealment from Prime of what they had done (SAC, ¶¶ 65-71, 139-40), as well as their failure to return Prime's Funds after Prime demanded its money back (SAC, ¶¶ 72-82, 141-42).

Additionally, "where money is turned over by a plaintiff to a corporate defendant to be used for a specific purpose for the benefit of the plaintiff, but is not used for that purpose, an action for conversion" is viable against the individuals who participated in the conversion, even if they were acting on behalf of a corporate defendant. *Air China, Ltd. v. Kopf*, 473 F. App'x 45, 50 (2d Cir. 2012). For this additional reason, Prime's conversion claim is valid against the individual Defendants who participated in misappropriating Prime's Funds. Without the benefit of discovery, Prime cannot possibly be expected to specify exactly which tortious actions each individual Defendant took with respect to Prime's Funds, but at this early stage, Prime submits that it has

plausibly alleged that Johnson and Mills, as Reign's principal officers and as the specific individuals who communicated with (and blatantly lied to) Prime about the status of its funds, were personally involved.  SAC, ¶¶ 59, 61, 66-74, 133, 139-42.  Karo was also involved because the initial misappropriation was done for his direct benefit, as well as because he personally and deliberately failed to enable Prime's Funds to be returned after it made a demand.  SAC, ¶¶ 55-56, 61-63, 135, 143-44.  Accordingly, the SAC asserts Prime's conversion claim against the individual Defendants as well as against Reign.

### D.    The Quasi-Contract Claims Are Cognizable Because Prime Has Now Voided the Contract.

A plaintiff is free to assert quasi-contract claims if the underlying contract is claimed to be "invalid or unenforceable."  *See Lamoureux*, 592 F. Supp. 3d at 38.  Here, Prime claims exactly that: the Agreement is unenforceable because Prime voided it.  Thus, Prime's quasi-contract claims (promissory estoppel against the Defendants with which Prime interacted directly, and unjust enrichment against Karo as the beneficiary of the misappropriation of Prime's Funds) are valid.

Quasi-contract claims can be pled alongside tort claims where the facts which must be proven are different for the respective claims, such that the "plaintiff may fail on one but still prevail on the other."  *See In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 325 (S.D.N.Y. 2019).  The elements of promissory estoppel and unjust enrichment are distinct from the elements of fraud and conversion, so Prime's tort and quasi-contract claims are not duplicative.

### E.    This Court Has Long-Arm Jurisdiction over Karo.

"[P]rior to discovery, a plaintiff may defeat a motion to dismiss for lack of personal jurisdiction by pleading, in good faith, . . . legally sufficient allegations of jurisdiction. The Court must construe the pleadings and submissions in the light most favorable to the plaintiff, and the

Court must resolve all doubts in its favor." *Solvents & Petroleum Serv., Inc. v. Cyber Sols. Integration Inc.*, No. 521CV485FJSTWD, 2022 WL 798333, at \*2 (N.D.N.Y. Mar. 16, 2022).

All of the Defendants in this action are out-of-state, but tellingly, they do not challenge this Court's jurisdiction for any of them besides Karo. This is doubtless because they know that Reign, Johnson, and Mills would have no basis for such a challenge because their dealings with Prime, which is located in New York, clearly confer jurisdiction under N.Y. C.P.L.R. 302(a)(1). *See* SAC, ¶¶ 5, 15-57, 65-82. "Negotiating a single contract signed in New York is enough to confer personal jurisdiction over a defendant even if the defendant never set foot in New York State." *Loop Prod. v. Cap. Connections LLC*, 797 F. Supp. 2d 338, 347 (S.D.N.Y. 2011); *see also State v. Vayu, Inc.*, 39 N.Y.3d 330, 337, 206 N.E.3d 1236, 1242 (2023). Seeking funding from a New York investor also confers jurisdiction. *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1109 (2d Cir. 1997); *L & R Expl. Venture*, 22 A.D.3d at 221, 804 N.Y.S.2d at 287. More generally, so does frequent contact, including emails and phone calls, to a party located in New York. *HD Brous & Co. v. Synthesys Secure Techs., Inc.*, 229 F. Supp. 2d 191, 194–95 (E.D.N.Y. 2002); *Melkaz Int'l Inc. v. Flavor Innovation Inc.*, 167 F.R.D. 634, 637 (E.D.N.Y. 1996); *Vayu, Inc.*, 39 N.Y.3d at 337, 206 N.E.3d at 1242.

What may not have come across clearly in the FAC – a shortcoming rectified in the SAC – is that Prime's principal basis for haling Karo into a New York court is that the other Defendants (Reign, Mills, and Johnson) were all acting as agents of Karo when they solicited Prime's prospective and actual business. "To establish an agency relationship for purposes of personal jurisdiction, a plaintiff must show that the alleged agent acts for the benefit of, and with the knowledge and consent of, the non-resident principal, and over which that principal exercises some control"; the court's analysis must take into account "the realities of the relationship in question

rather than the formalities of agency law." *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 318–19 (S.D.N.Y. 2009).

Here, the events that transpired after Prime entered into the Agreement strongly support Prime's assertion that all of the pre- and post-Agreement misrepresentations and misconduct by Reign, Mills, and Johnson were done on behalf of, and with the knowledge and approval of, Karo, with the goal of securing cash for him. Although it is impossible at this early stage for Prime to fully describe Karo's participation in Defendants' fraudulent scheme, it is highly significant that Karo was copied on the email exchange between Prime and Johnson in October 2022 wherein Johnson directly solicited funds from Prime which would have been placed under Karo's control and Prime declined the deal due to Karo's proposed involvement. SAC, ¶¶ 42-45. In other words, Karo was aware, even before Prime's Funds had actually been misappropriated for his benefit, that (A) his co-defendants were actively trying to put him in control of funds from a New York entity, and (B) Prime expressly did not want him to have access to its funds. Yet just a few weeks later, when Prime wired Prime's Funds intended for the arbitrage program, Reign quickly encumbered Prime's Funds with a loan whose proceeds were promptly paid out to Karo, then proceeded to lie to Prime for months about what it had done. SAC, ¶¶ 58-71. Reign finally acknowledged the impropriety of its actions by admitting that it owed Prime its money back and pretending that it was working with "the parties who have release authority over the capital" (i.e., presumably, Karo) to facilitate the release of the funds. SAC, ¶¶ 77, 84. The promised release of funds never occurred – likely because Karo chose not to cooperate. SAC, ¶¶ 78-80, 84, 143-44.[8]

---

[8] In addition to being a strong circumstantial indicator of fraud, Karo's recalcitrance also supports Prime's assertion of its conversion claim against him personally. *See* SAC, ¶¶ 143-44.

At this early stage of the case, these highly suspicious facts are more than sufficient to support an inference that Karo was emphatically <u>not</u> a "passive" beneficiary of Prime's involuntary largesse who had no control over the situation and no "awareness or knowledge" of what his co-conspirators were up to. *Cf. Chapin Home for the Aging v. McKimm*, No. 11CV0667FBRER, 2014 WL 12883697, at *5 (E.D.N.Y. Aug. 7, 2014), *report and recommendation adopted*, No. 11-CV-00667 FB RER, 2014 WL 4662401 (E.D.N.Y. Sept. 18, 2014) (relied upon by Defendants). Rather, he was an active participant in – and, in all likelihood, the mastermind of – Defendants' fraudulent scheme. He was fully aware that his confederates were seeking funds from a New York company, that their collective intention was to use those funds for his benefit, and that commandeering those funds would obviously have effects on Prime in New York. SAC, ¶¶ 55-57, 61-63.

Prime has adequately alleged that this Court should exercise conspiracy jurisdiction over Karo. Defendants' motion to dismiss Karo from this action must be denied.[9]

## II.   DEFENDANTS CANNOT RELY UPON THE AGREEMENT TO DEFEAT PRIME'S CLAIMS BECAUSE PRIME HAS VALIDLY VOIDED THE AGREEMENT.

### A.   Prime Has Validly Voided the Agreement, Clearing the Way for the Tort and Quasi-Contract Claims It Now Asserts.

As discussed above, Prime has elected to invoke the Escape Clause, which authorizes a contracting party to unilaterally void the entire Agreement if the other party has breached it and then failed to cure that breach within 10 days. Thus, Prime acknowledges that as a threshold matter, to determine whether Prime's claims are viable and whether Defendants can invoke the

---

[9] Alternatively, at most, the motion should be granted without prejudice so Prime can re-add Karo to the case if discovery ultimately confirms his suspected involvement in Defendants' conspiracy.

Agreement to evade those claims, the Court must ascertain whether Prime has adequately alleged that it is entitled to void the Agreement due to a breach and failure to cure by Reign.[10]

The Agreement provided that once Prime funded its account at Berone, Reign would promptly use that account to take Prime into the Program. According to ¶ 2.3, it would take "approximately 5-6 business days" for Reign to apply to enter the Program, then "four (4) weeks" from the commencement of the Program for profits to begin to be disbursed back to Prime. Paragraph 2.3 further required Reign to "provide confirmation of each major step in the process to [Prime], including when the BNP Paribas account is open, when [Reign] has received the required BCL[11], submitted to the program, been approved by the program and the date the program begins."

Meanwhile, ¶ 1.5 protected Prime's investment by guaranteeing that if the investment Program "does not perform," Reign would immediately "unwind" Prime's investment account and facilitate the return of Prime's Funds, a process that would only "take up to 5-7 banking days from the demand of [Prime] to receive their funds back due to non-performance of the trade program." And ¶ 1.4 of the JVA[12] provides that Reign "is hereby authorized to enter into Private Placement contracts, after [Prime] has funded their account at the hedge fund, under [Reign's] name to facilitate and assist in the process of entering into an investment structure or facilitate a private placement investment opportunity . . . . This shall not authorize [Reign] to invade, deplete or

---

[10] Notably, the Escape Clause does not require any notice of breach or notice of termination for Prime's termination to be effective. Even if it did, notice would be unnecessary in this case because Reign's misconduct amounted to a complete repudiation of the contract that undermined its very essence. *See* 28 N.Y. Prac., Contract Law § 13:13 ("Notice and cure—Where compliance is not necessary").

[11] "BCL" is a bank confirmation letter. *See* JVA, Dkt. No. 4-2, ¶ 2.12.1.

[12] The reference in ¶ 42 of the FAC to ¶ 1.4 of the Agreement is a typographical error, which Plaintiff proposes to correct in ¶ 64 of the SAC. The reference was intended to be to ¶ 1.4 of the JVA.

transfer any funds . . . .," confirming that Reign was not authorized to use Prime's Funds for purposes other than the agreed-upon arbitrage investment program.

Thus, per the terms of the Agreement, within a week or so of October 21, 2022 (the date that Prime wired Prime's Funds to its hedge fund account at Berone), Reign should already have successfully created the required BNP Paribas account and should have taken Prime into the Program, or at least been on the verge of entering it.  Reign should also have been proactively providing Prime with prompt and truthful updates regarding the status of this process.

Reign did neither of these things.  Instead, it surreptitiously encumbered Prime's Funds by using them as collateral for an unauthorized line of credit transaction that was completely unrelated to the Program.  Reign then promptly remitted the funds from that line of credit to Karo, an individual Prime expressly warned Defendants it did not want to do business with.  SAC, ¶¶ 22, 42-46, 58-61.

Prime, meanwhile – having received none of the status updates that Reign was contractually obligated to provide – reached out to Mills on November 18, 2022 to inquire about the status of its investment.  Over the ensuing months, despite having already absconded, on November 7, 2022, with $12 million in loan funds obtained by improperly collateralizing Prime's Funds, and having taken no steps whatsoever to take Prime into the Program, Mills repeatedly and deliberately lied to Prime about the status of the fictitious investment program through late January 2023 in an egregious attempt to cover up Defendants' brazen conversion of Prime's Funds.

Although Prime did not discover Defendants' wrongdoing until months later, Reign had essentially been in continuous and uncured breach of the Agreement ever since Prime first funded its account in October 2022.  At the very latest, Reign was in material breach of the Agreement on November 1, 2022 when it collateralized Prime's Funds in a loan deal completely unrelated to the

Program, and/or on November 7, 2022 when the $12 million in loan proceeds were disbursed to Karo. Accordingly, although Prime did not discover this fact until much later, Prime has essentially been entitled to immediate voiding of the Agreement ever since November 2022.

The Agreement contains no omnibus survival clause, and none of its individual provisions[13] contain survival clauses. Thus, each provision of the Agreement is now void.

**B.    The Agreement's Limitation of Liability Clause Does Not Bar Prime's Claims Against Reign.**

Defendants argue that Reign cannot be liable for returning Prime's Funds because of a limitation of liability provision in the Agreement. Dkt. No. 26-1, p. 22. As a threshold matter, that provision contains no survival clause, so it is void because Prime has now validly voided the Agreement pursuant to the Escape Clause.

Alternatively, even if this Court were to conclude that this provision were not voided with the Agreement, the provision is void on its own merits. "[C]ontract provisions aimed at relieving a party from the consequences of his own fault are not viewed with favor by the courts and, thus, are construed strictly against the party seeking exemption from liability." *Ratermann v. Pierre Fabre USA, Inc.*, No. 22-CV-325 (JMF), 2023 WL 199533, at *10 (S.D.N.Y. Jan. 17, 2023). It is impermissible as a matter of public policy for a party to limit their liability for willful or grossly negligent acts. *In re CCT Commc'ns, Inc.*, 464 B.R. 97, 106 (Bankr. S.D.N.Y. 2011). Because Defendants' intentional misconduct clearly rose far beyond the level of mere negligence, the limitation of liability provision cannot protect them from the consequences of their malfeasance.

Additionally, the limitation of liability provision is invalid because it is fatally irreconcilable with another provision of the Agreement. The "RFI . . . shall not be liable" sentence

---

[13] Except, arguably, ¶ 1.5, which requires Reign to "unwind" the hedge fund account and facilitate the return of Prime's Funds "[o]n termination or cancellation of the Program."

relied upon by Defendants' motion is buried in ¶ 9.2 of the Agreement, which is entitled "INDEPENDENT ADVICE & REPRESENTATIONS." The balance of ¶ 9.2 is congruent with this title, explaining that Reign has advised Prime to seek legal and accounting advice regarding the "taxation and legal aspects" of the investment. The limitation of liability sentence is then incongruously tacked onto the end of the paragraph. However, based upon its title and the majority of its content, this is not the sort of paragraph in which a contracting party would expect to find a blanket limitation-of-liability clause.

Standing in conflict with ¶ 9.2 is ¶ 11.1, entitled "WAIVER OF RIGHTS AGAINST CERTAIN PARTIES." Consistently with its title – and directly contrary to Defendants' characterization of this provision (Dkt. No. 26-1, p. 22) – ¶ 11.1 reads as follows:

> [Prime] hereby waives all rights to pursue any action or to claim any liability or obligation on the part of Berone Capital Fund, LP, RBC Capital Markets or Signature Bank for lack of performance related to this Agreement and to any proposed profits to be generated under this Agreement. All rights have been waived since none of the stated entities are party to this Agreement or have any responsibilities under this Agreement that pertain to [Prime]. [Prime] has not waived any rights, against any party, with respect to obtaining the return of their initial investment capital.

(Emphasis added.)

On its face, this provision clearly prevented Prime from making claims for loss of "proposed profits" against the various financial institutions that were to be involved in the investment program, on the reasonable basis that said institutions were not parties to the Agreement. However, the provision just as clearly assures Prime that it has not waived claims for the return of Prime's Funds "against any party" – which, at a bare minimum, must include Reign. And it is this provision – not ¶ 9.2 – which is more consistent with the remainder of the Agreement, which provides, e.g., that Reign is responsible for ensuring that Prime's Funds are returned if the investment program does not perform (¶ 1.5), that Reign is not liable for "profits or returns" (read

18

in context, this language appears to mean returns on investment, as distinguished from the return of Prime's principal) (¶ 2.4), and that a "contravening Party" must "indemnify" any "money obtained" by it (¶ 6.4.1).

In deciding which of these irreconcilable contract provisions to honor, the Court must (1) draw inferences against the party which drafted the contract (*Onekey, LLC v. Byron Place Assocs., LLC*, 200 A.D.3d 896, 160 N.Y.S.3d 301, 304 (2021)), (2) preferentially enforce more specific clauses at the expense of less specific ones (*Speedfit LLC v. Woodway USA, Inc.*, No. 22-CV-4733 (CS), 2022 WL 17167985, at *8 (S.D.N.Y. Nov. 22, 2022)), and (3) preferentially enforce the more "important" clause (*Israel v. Chabra*, 12 N.Y.3d 158, 168 n.3, 906 N.E.2d 374, 380 n.3 (2009)). Here, Reign drafted the Agreement, and the non-waiver provision of ¶ 11.1 is more specific and more important (as reflected by its greater visibility and greater consistency with the rest of the Agreement) of the two competing provisions. Thus, the non-waiver clause of ¶ 11.1 must trump the purported limitation of liability clause of ¶ 9.2.

Finally, on October 10, 2022 – after the Agreement had been signed, but before Prime wired its funds – Prime emailed Mills for the express purpose of confirming whether Prime's Funds would be returned if the arbitrage investment program was not a success. Mills not only answered in the affirmative, but confirmed that a return of Prime's Funds would take no more than two weeks and that Reign would be responsible for unwinding the account. This post-Agreement promise confirms that despite ¶ 9.2, Reign was (and remains) responsible for returning Prime's Funds.

### III.     THE ARBITRATION CLAUSE IS UNENFORCEABLE.

"Parties may only be required to arbitrate if they have agreed to do so. First, the Court must determine whether a valid arbitration agreement exists between the parties . . . . Second, if the Court finds that a valid arbitration agreement exists between the parties, then considers whether

the parties' dispute is within the scope of the arbitration agreement." *Alvarez v. Experian Info. Sols., Inc.*, No. 19CV03343JSJMW, 2023 WL 2519249, at *4 (E.D.N.Y. Mar. 15, 2023); *see also Ne. & Cent. Contractors, Inc. v. Quanto Cap., LLC*, 203 A.D.3d 925, 165 N.Y.S.3d 111, 114 (2022) ("The threshold issue of whether there is a valid agreement to arbitrate is for the court and not the arbitrator to determine.").

Importantly, the Court should not begin its analysis by applying a "presumption of arbitrability." The authority cited by Defendants for this standard of review, *Webb v. Wellins*, No. 98-CV-1113(FJS)(GJS), 1999 WL 31113 (N.D.N.Y. Jan. 21, 1999), is out of date. The Supreme Court's 2010 decision in *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010), "abrogated some elements of [the Second Circuit's] previous arbitrability jurisprudence" by establishing that "courts may invoke a presumption of arbitrability only where the parties' dispute concerns a valid and enforceable agreement to arbitrate that is ambiguous as to its scope." *Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023). Under current law, "the presumption of arbitrability is a court's last, rather than first, resort." *Id.* at 114. Because the Arbitration Clause at issue here is not valid and enforceable, and because Prime's claims are clearly not within its scope, this Court need not employ any presumptions of last resort.

### A.    The Arbitration Clause Has Been Voided by Prime's Termination of the Agreement.

No valid arbitration agreement exists between Prime and Reign. Now that Prime has voided the entire Agreement, the Arbitration Clause has been voided.

Although some cases hold that the threshold issue of whether a contract has been terminated is arbitrable, upon closer examination it is clear that termination is an arbitrable

question only when the underlying contract contains an extremely broad arbitration clause.  *See,*
*e.g.*, *L & R Expl. Venture v. Grynberg*, 22 A.D.3d 221, 222, 804 N.Y.S.2d 286, 287 (2005).

Here, the Arbitration Clause (¶ 7 of the Agreement) reads in relevant part as follows: "In
all cases, the contracting Parties herein shall settle any such dispute as may <u>arise</u> locally, upon
mutual agreement, unless arbitration becomes necessary. . . .  Every attempt shall be made to
resolve disputes <u>arising from intended or inadvertent violation of this Agreement</u>, as possible.  In
the event that adjudication is required . . ." (emphasis added).

The word "arising" holds talismanic power in the context of arbitration clauses: if "arising"
appears alone in an arbitration clause (i.e., not accompanied by more expansive language such as
"in connection with" or "relating to"), the clause is narrow – not broad – and does <u>not</u> require
collateral or threshold issues to be referred to arbitration.  *Petition of Kinoshita & Co.*, 287 F.2d
951, 953 (2d Cir. 1961) (holding that fraud in the inducement claim was not arbitrable because
arbitration clause "restrict[ed] arbitration to disputes and controversies relating to the interpretation
of the contract and matters of performance"); *cf. E & B Giftware, LLC v. Kinsbourne*, No. 14 CV
4709 VB, 2015 WL 2330469, at *3 (S.D.N.Y. May 12, 2015) (noting that whether a contract had
been terminated was an arbitrable question because the arbitration clause was <u>not</u> narrow).[14]

The Arbitration Clause here was narrow.  It only requires arbitration of "disputes arising
from" violations of a still-operative Agreement.  This case does not involve any such disputes.
Rather, Prime contends that (1) Reign violated the Agreement while it was still in effect, (2) Prime
has validly exercised its right under ¶ 10.1 to void the entire Agreement, <u>including the Arbitration
Clause</u>, and (3) now that the Agreement is no longer in effect, Prime now seeks to be restored to

---

[14] Whether contract termination is an arbitrable question in the face of a narrow clause may be a
matter of first impression.  The undersigned's legal research has uncovered no cases with the same
fact pattern presented here (i.e., a narrow arbitration clause appearing in a cancelled contract).

its pre-Agreement status quo by getting its money back.  Although the events which gave rise to this action involved the erstwhile Agreement, that Agreement is been null and void, so Prime's claims for restitution and consequential damages cannot "arise from" it.

Notably, in its arbitration rules booklet, the ICC recommends that parties adopt the following broad arbitration clause: "All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rule."  ICC, *Arbitration Rules & Mediation Rules* booklet, p. 79 (available at https://iccwbo.org/news-publications/arbitration-adr-rules-and-tools/arbitration-rules-and-mediation-rules/)     (emphasis added).  The fact that the Agreement eschews this broad clause in favor of less expansive phrasing indicates that the Arbitration Clause was intended to be narrow.

The tentative language of the Arbitration Clause further confirms that the clause is narrow and does not require arbitration of a post-termination dispute.  Twice, the Arbitration Clause urges the parties to resolve disputes informally "unless arbitration becomes necessary" (¶ 7.1, emphasis added), in which case it notes that "[i]n the event that adjudication is required, local process shall be proceeded with . . ." (¶ 7.2,[15] emphasis added).  This conditional phrasing – especially when coupled with an Escape Clause authorizing unilateral voiding of the entire Agreement – contrasts starkly with the kind of broad arbitration clauses which are typically in play when courts refer threshold or collateral issues to arbitration.  *Cf. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 371 F. Supp. 2d 571, 575–76 (S.D.N.Y. 2005), *amended*, No. 03 CIV. 2387 (LAK), 2005 WL 1489176 (S.D.N.Y. June 22, 2005); *Clifton D. Mayhew, Inc. v. Mabro Const., Inc.*, 383 F.

---

[15] The subsequent language in ¶ 7.2 appears to envision arbitration before the International Chamber of Commerce ("ICC") as the option initially referred to as "local process."

Supp. 192, 195 (D.D.C. 1974); *Wu v. Uber Techs., Inc.*, 78 Misc. 3d 551, 569, 186 N.Y.S.3d 500, 517 (N.Y. Sup. Ct. 2022).[16]

### B.     Prime's Claims Do Not "Arise From" the Agreement.

Even if the Agreement had not been voided, Prime's claims in this action still would not be arbitrable.  Strictly speaking, Prime does not seek to enforce its contractual rights: this case involves tort and quasi-contract claims which are independent of the parties' voided contract.

When "[f]aced with a narrow arbitration clause, a court . . . must consider whether the question at issue is on its face within the purview of the clause," keeping in mind that "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *New York News Inc. v. Newspaper Guild of New York*, 927 F.2d 82, 83–84 (2d Cir. 1991).

For essentially the same reasons set forth in Point III.A. above, Prime's substantive claims are non-arbitrable.  Although non-contract claims that are related to a contract (e.g., fraud in the inducement) may be arbitrable if the contract in question contains a broad arbitration clause (*see, e.g.*, *Norcom Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198, 204 (S.D.N.Y. 2000)), the Arbitration Clause here is (as discussed *supra*) a narrow one which only requires arbitration of "disputes arising from" violations of the Agreement.  Prime's claims are far broader than that: it

---

[16] The inconsistency of the Agreement further constrains the scope of the Arbitration Clause and cast doubt on its enforceability.  Although ¶ 7 purports to contemplate arbitration, ¶ 7.1 also discusses "jurisdiction" as if the parties were submitting to the authority of an actual court, and ¶ 7.2 references "adjudication" and "judicial resolution."  Paragraph 7.2 also fails to identify what decision-making entity has ultimate authority, stating "this matter is to be settled by which is recognized as the Agency having authority over matters of the I.C.C. itself" (emphasis added; for this sentence to be intelligible, the name of some entity would need to be appear between the words "by" and "which").  And ¶ 7 is irreconcilable with ¶ 9.11, entitled "COURT RULING," which provides that "The Parties agree that enforcement of this Agreement shall be in the courts of mutually agreed jurisdiction" (emphasis added).  The Escrow Agreement also contains a forum selection clause requiring disputes to be litigated in New York courts.  Dkt. No. 4-3, ¶ 3.4.  *See* Point II.B. above (explaining why the contract must be construed against Reign).

alleges serious, independently tortious misconduct by Defendants which is actionable regardless of the Agreement. The gravamen of Prime's claims is that Defendants deliberately misled it into placing its funds under their control so that they could misappropriate those funds for Karo's benefit – a purpose which had nothing to do with the fictitious investment program contemplated by the Agreement. Thus, Prime's claims are not subject to arbitration.

Even if some of Prime's claims could be deemed arbitrable, the bulk of its claims, especially those asserted against the individual Defendants, are clearly non-arbitrable.[17] *See City of Almaty, Kazakhstan v. Sater*, No. 19CV2645AJNKHP, 2019 WL 6681560, at *9–10 (S.D.N.Y. Dec. 6, 2019), *objections overruled sub nom. City of Almaty v. Sater*, No. 19-CV-2645 (AJN), 2021 WL 4940304 (S.D.N.Y. Oct. 22, 2021) (refusing to compel a plaintiff to arbitrate quasi-contract and tort claims against an officer of a signatory company). Although the typical course of action when some but not all of the claims presented are arbitrable is to "stay the balance of the proceedings pending arbitration," *see, e.g.*, *Pike Co., Inc. v. Tri-Krete Ltd.*, 349 F. Supp.3d 265, 279 (W.D.N.Y. 2018), another option, preferred by some New York courts when "nonarbitrable claims are inextricably intertwined with . . . arbitrable claims," is to deny arbitration and require all claims to proceed in court. *ALP, Inc. v. Moskowitz*, 204 A.D.3d 454, 456, 167 N.Y.S.3d 45, 51 (2022); *but see* 5 N.Y. Jur. 2d Arbitration and Award § 53 (noting inconsistency between cases on whether a stay or a denial of arbitration is preferable). Prime submits that allowing all of its claims to proceed in court is the better approach here because any potentially arbitrable issues are overshadowed by non-arbitrable issues involving misconduct beyond the scope of the Agreement.

---

[17] This is especially true for the claims against Karo, who never acted as an agent of Reign and cannot benefit from Reign's contract with Prime.

### C.     Defendants' Motion to Compel Arbitration Must Be Denied.

As set forth above, this Court should deny Defendants' motion to compel arbitration on the papers.  There are no issues of fact because the Court must draw all inferences in Prime's favor, Prime has voided the Agreement, and Defendants have not cast any doubt on this allegation.[18]  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (explaining the standard of review and burdens of proof).[19]

Finally, even if this Court concludes that some of Prime's claims are arbitrable, it lacks jurisdiction to compel the parties to arbitrate in Washington, D.C. before the ICC, as specified by the Agreement.  At most, it can compel arbitration in New York (finding that Defendants waived the Agreement's venue clause, and invoked this Court's jurisdiction, by making their motion here).  *See Indian Harbor Ins. Co. v. Glob. Transp. Sys., Inc.*, 197 F. Supp. 2d 1, 3 (S.D.N.Y. 2002).

### CONCLUSION

For the foregoing reasons, Prime respectfully requests an Order denying Defendants' motion to dismiss or compel arbitration, granting Prime's cross-motion to amend its complaint, and granting such other and further relief as this Court deems just and proper.

---

[18] Nor can they plausibly deny it, considering that they acknowledged the termination by admitting that they owed Prime its money back.  SAC, ¶ 73-74, 77.  Indeed, this acknowledgment forestalls any possible need for arbitration: there are no issues of fact or contract interpretation left for an arbitrator to "adjudicate" (Agreement, ¶ 7.2), since Reign has already admitted its culpability.

[19] Alternatively, to the extent that the Court concludes that there is a dispute of fact relevant to arbitrability, a "framed-issue" evidentiary hearing must be held before Defendants' motion can be decided.  *Ne. & Cent. Contractors, Inc.*, 165 N.Y.S.3d at 114.

Dated: July 21, 2023                    GIRVIN & FERLAZZO, P.C.
       Albany, New York


                                        By:_____
                                            Daniel S. L. Rubin, Esq.
                                            Bar Roll No.:  518414
                                            Patrick J. Fitzgerald, Esq.
                                            Bar Roll No.: 511103
                                            Bonnie R. Watson, Esq.
                                            Bar Roll No.: 701354
                                            *Attorneys for Plaintiff*
                                            20 Corporate Woods Boulevard
                                            Albany, New York 12211
                                            Tel:    518-462-0300
                                            Fax:    518-462-5037
                                            dsr@girvinlaw.com
                                            pjf@girvinlaw.com
                                            brw@girvinlaw.com


TO:    Adam R. Shaw, Esq.
       BOIES SCHILLER FLEXNER LLP
       *Attorneys for Defendants*
       30 South Pearl Street, 11th Floor
       Albany, New York 12207
       Tel: (518) 434-0600
       Fax: (518) 434-0665
       ashaw@bsfllp.com

       Blake Goebel, Esq.
       Cameron C. Miller, Esq.
       BOIES SCHILLER FLEXNER LLP
       *Attorneys for Defendants*
       1401 New York Ave. NW
       Washington, DC 20005
       Tel: (202) 237-2727
       Fax: (202) 237-6131
       bgoebel@bsfllp.com
       cmiller@bsfllp.com